IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

AARON ALEXANDER ANELLO,

                Plaintiff,

      v.

MAX WILLIAMS, Director of Department
of Corrections, M. NOOTH, Superintendent,
CAPT. PETERSON (FNU), SGT. MENA (FNU),
CPL. FUGATE (FNU); C.O. RUX (FNU),
JOHN DOE #1, C.O., JOHN DOE #2,
JOHN DOE #3,

                Defendants.

3:10-CV-622-AC

FINDINGS AND
RECOMMENDATION

ACOSTA, Magistrate Judge:

*Findings and Recommendation*

      Plaintiff Aaron Alexander Anello ("Anello"), is a state prisoner proceeding *pro se* and *in forma pauperis* in this civil rights action pursuant to 48 U.S.C. § 1983 and the Religious Land Use

and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc-1 *et seq*. Anello is in the custody of the Oregon Department of Corrections ("ODOC") and is currently housed at Snake River Correctional Institution ("SRCI"). Anello brings claims for violations of his First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights against ODOC Director Max Williams ("Williams"), SRCI Superintendent M. Nooth ("Nooth"), and several SRCI correctional officers, Captain Peterson ("Peterson"), Sergeant Mena ("Mena"), Corporal Fugate ("Fugate"), C.O. Rux ("Rux"), John Doe #1, John Doe #2, and John Doe #3 (collectively "Defendants"), in their individual and official capacities as ODOC employees.

Presently before the court is the defendants' motion for summary judgment. For the reasons set forth below, the motion should be granted.

*Background*

A. Housing History and Applicable Regulations

Anello was admitted to ODOC custody on July 12, 1996, and is currently housed at SRCI in Ontario, Oregon. (Schultz Decl. (docket #48), ¶ 3, Ex. 1, p. 1.) He arrived SRCI on August 24, 2004, and was originally housed in the Disciplinary Segregation Unit ("DSU") to serve time on a disciplinary sanction. (*Id*.) After his release from DSU, Anello lived in general population from December 1, 2004, until March 31, 2005, when he was placed in DSU because he was found in possession of a weapon. (*Id*. at ¶¶ 4-5.) After completing this disciplinary sanction, Anello was housed in the Intensive Management Unit ("IMU") from July 28, 2005, until April 5, 2007, when he was transferred to general population and placed under the supervision of Security Threat Management ("STM") staff as a high-alert inmate without restrictions. (*Id*. at ¶ 5.) Anello was under STM supervision at all times relevant to his Complaint. (*Id*. at ¶ 19.)

STM is governed by ODOC administrative rules found in Chapter 291, Division 69, and is designed to assist ODOC personnel to identify and manage individual "inmates and groups of inmates that in the judgment of the department present an elevated security threat risk based on their criminal history, institutional conduct history, present behavior, interstate transfer status, escape history, and based on intelligence." O.A.R. 291-069-0200(2); O.A.R. 21-069-0230(1).[1] An inmate may be identified as a high alert inmate based on several criteria, including for weapons offenses. O.A.R. 291-069-0230(2), Attachment A. "High alert" inmates may be managed by the STM Unit which consists of the STM Assistant Chief, STM Lieutenants, and STM Intelligence Analysts. O.A.R. 91-069-0270(1); O.A.R. 91-069-0210(9). The STM Lieutenant will develop an approved Inmate Management Plan ("IMP") for each "high alert" inmate, which shall describe, in writing, the "circumstance(s) that resulted in the inmate's identification as 'high alert' and the department's corresponding program and behavior expectations," which can include the "denial, removal, suspension, restriction or modification of inmate programs, services or activities . . . to encourage an inmate to modify his or her behavior to conform to department rules[.]" O.A.R. 91-069-0270(2)(a)-(b). All changes to an inmate's programs, services, or activities must be documented on the inmate's IMP, and the inmate provided a copy. O.A.R. 91-069-0270(c)-(d). "Programs, services, and activities that may be affected include, but are not limited to, recreation yard, housing assignments, work assignments, canteen use, telephone use (except legal calls), visiting (except attorney visits), inmate-to-inmate mail, and television services." O.A.R. 91-069-0270(3)(b). Any suspensions or changes to an

---

[1] Even though defendants have attached a copy of the applicable STM rules as Exhibit 2 of the Schultz Declaration, all citations are directly to the applicable rules.

inmate's programs or services must be in accordance with the STM Restriction Scale, which

provides in relevant part that if the restriction is based solely on managing the inmate, and is the

first restriction of its kind, it shall last between one and seven days. O.A.R. 91-069-0270(3)(b)(D),

Attachment B.  All other restrictions require additional approval.  *Id.*

B.  Factual Background

On or about 9:10 a.m. on May 30, 2008, correctional officer Gilbertson stopped Anello in

the chapel area and questioned him about papers he was carrying.  (Compl. (docket # 1), ¶ 14;

Gilbertson Decl. (docket # 49), ¶¶ 3-5; Anello Decl. (docket #55), Ex. B.)  Anello reported that he

was carrying artwork and a number of photocopies of the artwork that he had prepared as

"giveaway gifts" for an upcoming Native American powwow.  (Compl. at ¶ 14.)  Gilbertson

suspected that Anello had made the photocopies by using the chapel's copy machine, which he is

not authorized to use.  (Gilbertson Decl. at ¶ 5.)  Anello told Gilbertson that his girlfriend had

downloaded the artwork off the internet, made the copies, and sent them to him.  (Compl. at ¶ 15.)

Anello insisted that he was authorized to possess the artwork in the chapel area so long as it was

religious and or being used for religious purposes.  (*Id.* at ¶ 14.)  Gilbertson confiscated the

original and photocopies.  (Gilbertson Decl. at ¶ 6; Anello Decl., Ex. B.)  Gilbertson later returned

the originals but not the photocopies.  (*Id.*)

Later that day, around 12:00 p.m., Gilbertson searched Anello's cell and property, as well

as several other cells in Anello's housing unit, which were under investigation for extortion.[2]

(Schultz Decl. at ¶ 8, Ex. 3; Gilbertson Decl. at ¶ 7.)  Anello alleges that during the search,

---

[2]  Anello disputes defendants' claim that they were investigating his housing unit at the time
his cell was searched or that any other cells were searched.

Gilbertson "showed a blatant disregard for [his] property," dropped his CD-player, and refused to tell him why his cell was being searched. (Compl. at ¶ 14.) A few minutes later, defendants Mena, Rux, and three other unknown correctional officers (presumably the Doe defendants) confiscated all of Anello's property, including his legal papers, religious materials, and hygiene products. (*Id*. at ¶ 16.) Anello was also informed that his cell mate was being moved and he was being placed on cell restriction pending an investigation, though they would not tell him what the investigation was about. (*Id*.)

The "shakedown report," signed by defendant Peterson, notes that the confiscated items included washcloths, paper napkins, multivitamins, plastic containers, envelopes, rulers, pencil sharpeners, writing instruments, CDs, tennis shoes, 16 magazines, a card with a dried flower inside, numerous hygiene products, two legal totes, a religious hat, five books, and a large stack of drawings. (Schultz Decl. at ¶ 9, Ex. 4, p. 2; Anello Decl., Ex. C.) There was some evidence that Anello had not purchased some of the items. (*Id*.) Consequently, Anello was placed on cell restriction from May 30, 2008, until June 5, 2008, while defendants investigated whether the property was indeed unauthorized. (Schultz Decl. at ¶ 7, Ex. 3.)

The incident report indicates that after Anello was found in possession of 41 pages of unauthorized photocopied materials when returning from the chapel, his cell was searched, several property items confiscated, and his IMP modified to include property, recreation yard, gym, activity, and day room restrictions. (Gilbertson Decl., Ex. 1.) Anello could only leave his cell to attend programs if approved by Lieutenant Foote ("Foote"). (*Id*.) This redacted report was signed by "SRCI Schult," who is presumably Claude Schultz ("Schultz), the STM Unit Manager at SRCI, and the person who initially imposed the restrictions. (Schultz Decl. at ¶¶ 1, 8, 10.) Anello's

IMP, dated May 30, 2008, explains the restrictions as follows:

> Inmate restricted from dayroom, gym, recreation yard, and any activity
> outside of assigned housing unit.  Inmate may attend one (1) religious
> SERVICE per week.  Inmate also restricted from purchasing canteen and/or
> possessing property other than state issue.  Restrictions through 6/5/08.

(*Id.*, Ex. 3; Anello Decl., Ex. D.)

Shultz was deployed to a wildfire the following day, so Lieutenant Foote ("Foote") was

the supervisor who maintained the restrictions in Schultz's absence.  (Schultz Decl. at ¶ 10.)

Foote has since passed away, so the specifics of the particular cell restrictions as actually applied

to Anello are not known; in lieu of that information, defendants have set forth evidence of what

the normal practice is when an inmate has restrictions on "property, recreation, yard, gym,

activities, and day room."  (*Id.* at ¶¶ 10-11.)  Under those restrictions, an inmate is prohibited from

possessing any personal property that he had purchased from the canteen, but is permitted the

same state-issued property provided all inmates, which includes a long-sleeved blue shirt, t-shirt,

denim pants, briefs, red gym shorts, socks, shoes, shower thongs, and bedding.  (*Id.* at ¶ 11.)  The

inmate's property is stored in the STM Lieutenant's office until it is inventoried and then sent to

the main property room for storage during the restricted period.  (*Id.* at ¶ 12.)  Inmates are also

restricted from attending recreation yard, gym activities, and day room activities without staff

authorization.  (*Id.* at ¶ 13.)  Inmates may not use the telephones in the housing unit's day room

unless there is an "urgent need" that is approved by the STM manager.  (*Id.*)  Inmates are

permitted basic-state issued hygiene items and may shower, attend meals in the dining room,

religious services, official callouts, and work assignments.  (*Id.* at ¶¶ 14-15.)  Inmates have access

to the law library, programs, counselors, medical and mental health services, and all other

essential services. (*Id*.) Anello was permitted to attend just one religious service during the six-day restriction. (*Id*. at ¶ 16, Ex. 3; Anello Decl., Ex. D.)

While on cell restriction Anello claims that he spoke to several correctional officers, most of whom are not named as defendants, about the investigation, his cell restriction status, and the status of his property. (Compl. at ¶¶ 17-20.) On May 30 and 31, 2008, Anello explained to his unit officer, Streubel, that he had no hygiene items or legal materials to work on his appeals, and that his prayer hat, prayer feather, and other religious materials had been confiscated. (*Id*. at ¶ 17.) On June 1, 2008, Anello spoke to another correctional officer, Jackson, who told him that defendant Peterson said that he would be getting his property back that day. (*Id*. at ¶ 18.) The next day, because he did not receive his property back as promised, Anello spoke to yet another correctional officer, Willis, who spoke again to defendant Peterson, who told him that Anello was under investigation and that his property would be returned to him that night. (*Id*. at ¶ 19.) Anello's property was not returned and he still did not know what he was under investigation for, so that same day, on June 2, 2008, he borrowed a pen from another inmate to file a grievance. (*Id*. at ¶¶ 19-20.) On June 3, 2008, Peterson told Anello directly that his property would be returned that night. (*Id*. at ¶ 21.) The property was not returned that night. (*Id*.)

The investigation concluded on June 5, 2008, without issuance of a misconduct report. (Schultz Decl. at ¶ 17.) The following day, on June 6, 2008, Anello's property was returned, but he immediately noticed that several items, including his "legal totes," five books, religious prayer hat, and all of his artwork, amounting to 1,100 drawings, were missing. (Compl. at ¶ 22.) Anello immediately pointed out to defendant Mena that his legal totes were missing, and Mena said he would look into it, but never followed up. (*Id*.) Shortly thereafter, Anello reported to his

unit officer that he was missing additional property. (*Id.*) His unit officer called defendant Mena to report the additional missing items, but Mena allegedly stated that the materials were locked away in a Lieutenant's office and that he didn't have the key. (*Id.*)

On June 26, 2008, Anello claims that his grievance was returned with the notation that his complaint was not a "grieveable issue" and that in any event, defendant Peterson would return his prayer feather. (*Id.* at ¶ 23.) There is no copy of this grievance in the record. The next day officer Webb told Anello that Peterson confirmed that Anello was no longer under investigation and that the property officer had his missing property. (*Id.* at ¶ 24.)

On June 29, 2008, Anello wrote to the property officer, inquiring about the status of his property, and noting that he has receipts for several of the confiscated items. (*Id.* at ¶ 25; Anello Decl., Ex. E.) According to Anello, he received an undated response approximately one month later, on July 28, 2008, which stated that the property department did not have any of his property. (*Id.* at ¶ 26; Anello Decl., Ex. E.) Anello inquired as to the status of his property to several officers not named as defendants, but they all responded that they did not know where his property was located. (Compl. at ¶ 26.)

On November 3, 2008, Anello filed a Tort Claim Notice but received no response. (*Id.* at ¶ 27; Anello Decl., Ex. G.) He claims that he also sent a letter to the Department of Administrative Services Risk Management Division around this time. (*Id.* at ¶ 28.)

On March 9, 2008, Anello received a letter informing him that the Risk Management Division never received his Tort Claim Notice, and that he had 30-days to resubmit his claim and all the necessary documentation or else the claim would be denied and the file closed. (*Id.* at ¶ 29.) Sometime thereafter, but on an unknown date, he sent another copy of his original Tort

{SSM}

Claim Notice along with all the necessary documentation. (*Id.* at ¶ 30.) On April 10, 2009, he received a letter confirming receipt of the original tort notice, and informing him that his claim was under investigation. (*Id.* at ¶ 31.)

On an unknown date, Anello claims that he met with officer Webb to resolve his tort claim, they came to an agreement regarding the canteen property and books, and Webb agreed to send the agreement for approval to Corporal Fulwyer. (*Id.* at ¶ 32.) On June 16, 2009, when Anello met with Fulwyer, they were able to come to only partial agreement because she had not received the copy of the earlier agreement Anello had made with Webb. (*Id.* at ¶ 33.) According to Anello, he was "forced to take less than [he] was satisfied with," since he had no shoes after DOC had lost them, and no money to buy new ones because Fulwyler refused to charge a fair rate of exchange for the CDs, refused to reimburse him for two of his books, and required him to sign the Lost or Damaged Property form that had several typos. (*Id.*) A copy of the signed replacement property receipt indicates that the following property was lost or damaged:

> 2 legal boxes, 2 books (2 were donated books not recoverable), 1 pr tennis shoes, pencil sharpener, petroleum jelly, vitamins multi, 1 CD - Young Bird

(Anello Decl., Ex. F; Schultz Decl., Ex. 4, p. 2.)

Anello accepted the following property:

> 1 legal box (already purchased 1), 2 CD's - Metallica No Justice for All, American Slayer South of Heaven, 16 soups, 1 pr tennis shoes Nike Air, pencil sharpener, petroleum jelly, vitamins multi, 1 CD - Metallica Kill Them All.

(*Id.*)

On June 1, 2010, Anello filed his Complaint in this court, alleging that various ODOC personnel, acting in their individual and official capacities violated his statutory and constitutional rights. (Compl. at ¶¶ 1, 4-12, 37-65.) He seeks unspecified declaratory relief and compensatory

and punitive damages. (*Id.* at ¶¶ 1, 67-68.)

*Legal Standard*

Summary judgment is appropriate only when the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." *Id.* at 324. The court must "not weigh the evidence or determine the truth of the matter, but only [determine] whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F.3d 1047, 1054 (9th Cir. 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir.1989), *cert. denied*, 493 U.S. 809 (1989) (emphasis in original) (citation omitted). The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id.* (citation omitted).

In civil cases involving a plaintiff proceeding *pro se*, this court construes the pleadings liberally and affords the plaintiff the benefit of any doubt. *Alvarez v. Hill*, 518 F.3d 1152, 1158 (9th Cir. 2008). *Pro se* complaints are held to a less strict standard than those drafted by a lawyer. *Haines v. Kerner*, 404 U.S. 519, 520 (1972); *see also Bonner v. Lewis*, 857 F.2d 559, 563 (9th Cir. 1988). Before dismissing a *pro se* complaint, the court must, in many circumstances, instruct

the *pro se* litigant as to the deficiencies in the complaint and grant leave to amend. *See Eldridge*

*v. Block*, 832 F.2d 1132, 1136 (9th Cir. 1987). Nevertheless, a *pro se* plaintiff's claims may be

dismissed where it appears beyond doubt that the plaintiff can prove no set of facts in support that

would entitle him to relief. *Barrett v. Belleque*, 544 F.3d 1060, 1062 (9th Cir. 2008).

*Discussion*

A.  Personal Participation: Williams, Nooth, Fugate

Anello alleges violations of his First, Fourth, Fifth, Eighth, and Fourteenth Amendment

rights under § 1983. As a general rule, "liability under § 1983 must be based on the personal

involvement of the defendant." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998), *cert.*

*denied,* 525 U.S. 1154 (1999). Accordingly, "state officials are not subject to suit under § 1983

unless they play an affirmative part in the alleged deprivation of constitutional rights." *King v.*

*Atiyeh*, 814 F.2d 565, 568 (9th Cir. 1987). "A plaintiff must allege facts, not simply conclusions,

that show that an individual was personally involved in the deprivation of his civil rights."

*Barren,* 152 F.3d at 1194. There is no *respondeat superior* liability under § 1983. *Jones v.*

*Williams*, 297 F.3d 930, 934 (9th Cir. 2002) (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658,

691 (1978)). "A supervisor is only liable for constitutional violations of his subordinates if the

supervisor participated in or directed the violations, or knew of the violations and failed to prevent

them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citing *Ybarra v. Reno Thunderbird*

*Mobile Home Village,* 723 F.2d 675, 680-81 (9th Cir. 1984)).

Here, Anello makes no allegation that Williams or Nooth were personally involved in any

of the activities that allegedly deprived him of his rights. Instead, they appear to be listed only in

their supervisory capacities as prison administrators. (Compl. at ¶¶ 4-5.) Thus, they should be

dismissed on the § 1983 claims on the grounds that Anello has failed to articulate sufficient personal involvement. Moreover, Anello makes no factual allegations whatsoever against Fugate. While Anello mentions many SRCI correctional officers throughout his Complaint, he includes only a small subset of those as defendants. Fugate is not mentioned by name anywhere in the Complaint. Consequently, Anello has failed to allege sufficient personal involvement against Fugate and he should be dismissed.

Because there are no allegations of any actual personal involvement by Williams, Nooth, or Fugate, they should be dismissed on Anello's § 1983 claims.

B. Statutory Violation: RLUIPA

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability," unless the government demonstrates that the burden is "in furtherance of a compelling government interest" and is "the least restrictive means of furthering that . . . interest." 42 U.S.C. § 2000cc-1(a). RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson,* 544 U.S. 709, 721 (2005).

Anello "bears the initial burden of going forward with evidence to demonstrate a *prima facie* claim," that the government's action "constitute[s] a substantial burden on the exercise of his religious beliefs." *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005). RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). The state imposes a "substantial

burden" when it "denies an important benefit because of conduct mandated by religious belief,

thereby putting substantial pressure on an adherent to modify his behavior and to violate his

beliefs." *Warsoldier*, 418 F.3d at 995 (internal quotation and citation omitted). Defendants may

overcome the *prima facie* claim by providing evidence that the restriction is "in furtherance of a

compelling government interest and is the least restrictive means of furthering that interest."

*Shakur v. Schriro*, 514 F.3d 878, 889 (9th Cir. 2008) (internal quotation and citation omitted).

Defendants contend that Anello cannot sustain his initial burden because he does not

specify what religion he practices, much less that his practice was substantially burdened.

Anello's Complaint alleges that defendants violated his rights under RLUIPA when, during the

six days that he was on STM cell restriction, his religious materials were confiscated and he was

denied access to religious services. (Compl. at ¶¶ 54, 56.) He also alleges that his rights were

further violated when his Muslim prayer hat (Takya) was never returned. (*Id.* at ¶ 63.)

In his opposition materials, Anello clarifies that he is a Native American inmate who is a

Thelemite. (Pl's Memo. in Resp. to Summ. J. (docket #65) at pp. 10-13.) In 2000 or 2001, when

he became an associate member of Ordo Templi Orientis ("OTO"), the main body of Thelema, he

gave a copy of his associate member status to the SRCI chaplains, which was supposed to "go on

file that [Anello] was a practicing Thelemite." (*Id.* at p. 13.) Around this same time he was

initiated into Sufisim and received authorization to possess a Sufi Takya, a prayer hat, as part of

his personal possessions. (*Id.*; Anello Decl., Ex. H.) He has attended "all Sufi services" and

every "magic-based," service offered at SRCI as well as the Native American sweat lodges, pipe

ceremonies, meditation classes, and other religious services. (*Id.* at pp. 10-13.) He also performs

private Thelemic rituals in his cell since there are no organized Thelemic services at SRCI. (*Id.*)

Thus, Anello has set forth evidence of what religions he practices.

As for how his religious practices were burdened as a result of defendants' actions, Anello contends that he needed various papers in order to perform at least three complex Thelemic rituals. (*Id.* at pp. 12-13.) It is also undisputed that his prayer hat has not been returned or replaced. The court accepts that Anello needed access to various papers in order to perform his complete Thelemic rituals. However, Anello has failed to identify any practices that were burdened because of confiscation of his prayer hat. All Anello has done is provide documentation that he was authorized to possess the prayer hat, but has failed to explain how lacking this item burdens his religious practice in any way. Even assuming that the permanent loss of the hat interfered with some religious practice, a single negligent action does not normally amount to a RLUIPA violation. *See Muwwakkil v. Johnson*, 2010 WL 3585983, at * 7 (W.D. Va. September 13, 2010); *Hankins v. NYS Dep't of Corr. Svcs*, 2008 WL 2019655, at *6 n.44 (N.D.N.Y. March 10, 2008) (collecting cases). However, giving Anello the benefit of the doubt and viewing the facts in the light most favorable to him, he has set forth some evidence that the exercise of his religious beliefs were burdened during the time that he was without his religious materials. The next question is whether this amounted to a "substantial burden."

Even though RLUIPA bars inquiry into whether a particular belief or practice is central to a prisoner's religion, it "does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *Cutter*, 544 U.S. at 725 n.13; 42 U.S.C. § 2000cc-5(7)(A). "The truth of a belief is not open to question; rather the question is whether the objector's beliefs are truly held." *Id.* (internal quotation and citation omitted). It is Anello's burden to demonstrate that his religious belief is sincere. *Conner v. Tilton*, 2009 WL 4642392, at * 14 (N.D. Cal. December 2, 2009)

(citing *Vision Church v. Village of Long Grove*, 468 F.3d 975, 996-97 (7th Cir. 2006)).  Anello must also demonstrate that these actions amounted to a "substantial burden" on his ability to practice his religion.  The Ninth Circuit has clarified that a "substantial burden" is one that is "oppressive to a significantly great extent."  *Warsoldier*, 418 F.3d at 995 (internal citations and quotations omitted).  The burden "must impose a significantly great restriction or onus upon [religious] exercise," such as situations "where the state . . . denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his belief."  *Id.*

Anello professes membership in Native American, Thelemite, and Sufism religions, but with no explanation of his religious beliefs or practices.  The court recognizes that "[t]he rights of inmates belonging to minority or non-traditional religions must be respected to the same degree as the rights of those belonging to larger and more traditional denominations."  *Al-Alamin v. Gramley*, 926 F.2d 680, 686 (7th Cir. 1991).  The Thelemite religion does not have any universal requirements, and is centered upon encouraging members to develop their own "personal regimen of spiritual discipline" in order to fulfil the central tenet that members "Do what though whilt," which has been construed as a "divine mandate to discover [one's] true purpose in life."  *Koger v. Bryan*, 523 F.3d 789, 799 (7th Cir. 2008).  (discussing the religion of Thelema); *Grayson v. Schuler*, 666 F.3d 450, 455 (7th Cir. 2012) (noting that "Thelema's single mandatory tenet invites an infinity of optional observances.").  Given this broad "divine purpose," it is reasonable that Anello, as a Thelemite, might incorporate various rituals and beliefs from other religions.  However, beyond the blanket assertion that he was unable to perform some Thelemite rituals in his cell since he was without his detailed written materials, his allegation that the Sufi prayer hat

was permanently lost, and that he attends most all religious services offered at SRCI, Anello has

not provided any evidence of any particular religious rituals, exercises, or practices that he

performs, much less any that were substantially burdened by defendants' confiscation of his

property.  Anello has not set forth any elements of his "personal regimen of spiritual discipline"

that he maintains in order to fulfil the Thelemic divine mandate, such as that he writes in a daily

journal as part of his religious exercise or that he must pray daily while wearing the prayer cap.

*Koger*, 523 F.3d at 799.  Significantly, even though he claims he was denied access to "religious

services" generally, he does not identify that he missed any particular service, such as the

powwow or other important religious event.  In contrast to Anello's vague, unsupported

allegations, defendants have set forth evidence that Anello was permitted to attend one religious

service during this six-day period.  (Schultz Decl. at ¶¶ 15-16, Ex. 3.)

    A close reading of Anello's account of his complaints regarding this incident casts further

doubt on the sincerity of his religious beliefs or that any of them were substantially burdened.

While Anello was clearly dissatisfied with being on cell restriction, losing his cell mate, and

having all his property confiscated, his argument does not turn on the need for any items in

particular to engage in any religious practices.  (*See* Anello Decl., Exs. E, G.)  Notwithstanding

the fact that his account is almost completely unsubstantiated, even if the court accepts all the

allegations as true, Anello does not even claim to have drawn attention to the fact that he was

missing materials essential to the practice of his religion.  (*See* Compl. at ¶¶ 17-20.)  His

complaints about his missing prayer hat and other religious materials are lumped together with his

complaints about all of his other missing property and general dissatisfaction with being placed on

cell restriction.  (*Id*.)  By his own account, Anello only mentioned their loss to his unit officer

twice, on May 30 and 31. (Compl. at ¶ 17.) Anello finally secured a writing instrument from another inmate and filed a grievance about the missing property on June 2, 2008, but a copy of this grievance does not appear anywhere in the record, and Anello provides limited insight into the substance of that grievance other than to state that when it was returned it said something about defendant Peterson returning his prayer feather, "as if that would minimize the deprivations altogether." (Compl. at ¶¶ 20, 23.) Anello does include a copy of his June 28, 2008, inquiry regarding the status of his still missing property, (Anello Decl., Ex. E), but nowhere does he mention his missing religious materials or their importance to his religious practices. (*Id.*)

In his Tort Claim Notice filed on November 8, 2008, Anello lists many items as still missing at the time his property was returned to him on June 6, 2008. (Anello Decl., Ex. G, p. 2.) In addition to the missing prayer hat, Anello lists that he was still missing 1,100 personal drawings (which he sought compensation in the amount of $150,000), "Ridell Champ" cross-trainers, four personal books, one CD, a pencil sharpener, multivitamins, and a jar of petroleum jelly. (*Id.* at pp. 2-3.) He does not single out the loss of the prayer hat as exceptionally egregious or otherwise highlight its impact on his ability to practice his religion. Rather, he lumps this item together with his other lost possessions, including basic canteen items like petroleum jelly and multivitamins. He does not otherwise mention his other missing religious materials, including the powwow giveaway gifts that were never returned. Finally, the prayer hat is not even included on the property receipt form signed by Anello on June 17, 2009, which lists the property that was lost or damaged and the property accepted as replacement. (Anello Decl., Ex. F; Schultz Decl., Ex. 4, p. 2.) Even assuming, as Anello alleges, that this form contained some unspecified "typos," and inferring that one of these "typos" was that it failed to list the hat as one of the items that was

Page -17- FINDINGS AND RECOMMENDATION                                        {SSM}

lost/damaged, Anello has not demonstrated that he was any more concerned about the loss of his

prayer hat than he was about any of his other items. This would suggest that the loss of the hat

did not actually affect the practice of Anello's sincerely held religious practices in any way

whatsoever. It is also significant that in none of the above correspondence does Anello ever

specifically mention the loss of his Thelemite written materials, leading one to reasonably

conclude that they were returned to him with the bulk of his property on June 6, 2008.

Reviewing the record as a whole, Anello has failed to establish that any of his sincerely

held beliefs were burdened in any way, much less that they were substantially burdened. Anello

must do more than simply profess membership in various religious groups and possession of

religious materials in order to establish that confiscation of those materials amounts to a

substantial burden on his religious exercise. At most, Anello's claims regarding confiscation of

his religious materials, which occurred during the course of an investigation, amounted to a

temporary inconvenience on his ability to exercise his religion. Consequently, defendants should

be granted summary judgment on Anello's RLUIPA claims.

C. Constitutional Violation

    1. First Amendment

        a. Access to Courts

State prisoners have a constitutional right of access to the courts. *Bounds v. Smith*, 430

U.S. 817, 821 (1977). To establish a violation of this right, Anello must establish that he suffered

an actual injury. *Lewis v. Casey*, 518 U.S. 343, 349 (1996). To establish an actual injury, the

inmate must demonstrate "actual prejudice with respect to contemplated or existing litigation,

such as the inability to meet a filing deadline or to present a claim." *Id.* at 348.

Here, Anello's Complaint includes a few vague allegations that he was denied access to the courts "by the confiscation of my legal work and writing materials" (Compl. at ¶ 46), and that he told at least one correctional officer that he did not have anything "to work on my appeals" (*Id.* at ¶ 17).  In his opposition materials Anello claims that he lost his direct appeal "because of the lack of legal materials and inability to correspond with his attorney due to the deprivation of writing materials." (Pl's Memo. in Resp. to Summ. J. at p. 7.)  If true, this would amount to an actual injury necessary to establish a violation of his right to access the courts.  However, Anello provides no documentation or evidence in support of this allegation, and he was advised in the summary judgment advice notice (docket #13), he must "set out specific facts in declarations, depositions, answers to interrogatories, or authenticated documetns . . . that contradict the facts shown in the defendants's declarations and documents and show that there is a genuine issue of material fact for trial."  *See* FED. R. CIV. P. 56(c); *Matsushita Elec. Indus. Co. Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  This single unsupported allegation fails to satisfy this responsibility.

Because Anello is proceeding *pro se*, the court investigated his claim by performing a search of any appeals by "Anello" in the State of Oregon, which turned up three results.  One is dated 1979, which is many years before Anello entered ODOC custody in 1996.  The other two confirm that Anello's conviction was affirmed by the Oregon Court of Appeals on March 19, 2009.  *State v. Anello*, 226 Or. App. 604, 205 P.3d 101, *rev. denied*, 346 Or. 589, 214 P.3d 821 (2009).  Upon closer inspection, this appeal concerns Anello's conviction stemming from the weapons-related disciplinary incident that occurred at SRCI on March 31, 2005.  *Appellant's Brief, State v. Anello*, 2007 WL 6958332 (Or. App. January 2, 2007).  Judgment was entered on

December 27, 2005, the notice of appeal timely filed on January 24, 2006, Anello's brief filed on January 2, 2007, and decision rendered on March 19, 2009. *Id*. Anello was represented by counsel from the Office of Public Defense Services, who filed the appellate brief in early 2007, long before the property deprivation occurred in this case. While the appeal was indeed pending during the six-day period where Anello was without access to his legal materials, there is absolutely no evidence that this caused him lose the appeal.

Disregarding this inaccurate, unsupported statement, Anello has failed to establish an actual injury. It is clear that his two "legal totes" were permanently lost since they were listed on the lost or damaged property form completed in June 2009. (Anello Decl., Ex. F; Schultz Decl., Ex. 4, p. 2.) Anello provides no additional evidence that because of this loss, he also lost documents necessary for presenting any claims or that the he otherwise suffered an actual legal injury. Moreover, there is at least some evidence that he had access to the law library and was permitted to make legal phone calls or visit with his attorney during the six days that he was on cell restriction. (Schultz Decl. at ¶ 15; O.A.R. 91-069-0270(3)(b).) Anello's unsubstantiated allegations of harm are not enough to establish actual injury. *Lewis*, 518 U.S. at 348. Consequently, defendants should be granted summary judgment on Anello's claim for a violation of his First Amendment right to access the courts.

### b. Right to Redress Grievances

Anello claims that his First Amendment right to file grievances was violated because he was denied access to writing materials or the ability to file grievances during the six days that he was on cell restriction. (Compl. at ¶ 58.) Inmates have a First Amendment right to use the prison grievance system. *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005). By Anello's

own account, he not only filed grievances regarding the confiscation of his property, he did so during the six-day period that he was restricted from possessing any writing materials. (Compl. at ¶ 58.) A few weeks later, on June 28, 2008, he followed up with the property officer about the property that was still missing, on November 3, 2008, he filed a Tort Claim Notice, and on April 10, 2009, was informed that his claim was under investigation. (*Id.* at ¶¶ 25-31.) Ultimately, he accepted replacement property for at least some of the property that was lost. (Anello Decl., Ex. F; Schultz Decl., Ex. 4, p. 2.) Consequently, there is no evidence that he was prevented from using the available grievance process to challenge the confiscation of his property. Defendants should be granted summary judgment on this claim.

        c.  Free Association

      "[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). "[F]reedom of association is among the rights least compatible with incarceration." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). Anello alleges that his constitutional right to free association was violated when defendants moved his cell mate out when he was on "lock down," and when the cell mate was not moved back in once the investigation was over and his cell restrictions lifted. (Compl. at ¶ 59.) Inmates do not have a constitutional right to a cell mate. *See Jackson v. California*, 2007 WL 210430, at * 17 (E.D. Cal. January 26, 2007) (noting that there is no constitutional right to choice of a cell mate); *Malik v. Mack*, 15 F. Supp. 2d 1047, 1050 (D. Kan. 1998) (rejecting inmate's claim that his rights were violated when he was placed in a single cell instead of being assigned a cell mate).

      Notwithstanding the fact that Anello does not have a constitutional right to a cell mate, an

"inmate's status as a prisoner and the operational realities of a prison dictate restrictions on the associational rights among inmates." *Jones v. North Carolina Prisoners' Labor Uniton, Inc.*, 433 U.S. 119, 126 (1977). Restrictions that affect First Amendment rights are upheld only if the action is "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Here, defendants have presented evidence that at the time in question, Anello was under supervision of STM staff, his entire housing unit was under investigation for extortion, and after he was caught with unauthorized copies, his cell was searched. (Schultz Decl. at ¶¶ 8, Exs. 3-4.) During the search, several canteen items were discovered that defendants believed he had not purchased. (*Id.*) Consequently, he was placed on cell restriction, which included a limitation of many privileges, including the removal of his cell mate. (*Id.* at ¶¶ 11-17.) The decision regarding Anello's housing status and whether he could have a cell mate is reasonably related to the legitimate penological goal of institutional security. Thus, Anello's claim that defendants violated his First Amendment rights when he was housed in his own cell without a cell mate is without merit. Defendants should be granted summary judgment on this claim.

       d. Free Expression

     Anello alleges that defendants violated his First Amendment right to free speech and expression when they prevented him from using the prison phone and kept him "incommunicado" during the six days that he was on cell restriction. (Compl. at ¶¶ 45, 50.) His rights were further violated when defendants confiscated his artwork, art materials, correspondence materials, reading and writing materials, and political newsletters. (*Id.* at ¶¶ 38, 47, 48, 49, 51, 52.)

     Specifically with regard to the denial of telephone privileges, the Ninth Circuit has held that inmates have a First Amendment "right to communicate with persons outside prison walls.

Use of a telephone provides a *means* of exercising this right." *Valdez v. Rosenbaum*, 302 F.3d 1039, 1048 (9th Cir. 2002), *cert. denied*, 538 U.S. 1047 (2003) (emphasis in original). Courts in this district have concluded that an inmate's ability to communicate with the outside world is not unconstitutionally restricted where prison officials restricted an inmate from making non-emergency calls. *Brown v. Oregon Dep't of Corrections*, Case No. 10-03-BR, 2011 WL 2837444, at * 3 (D. Or. July 14, 2011) (citing *Barrett v. Hill*, 2006 WL 698185, at *2 (D. Or. March 13, 2006) *aff'd by* 202 F. App'x 217 (9th Cir. 2006). Here, the record reflects that while Anello was denied access to the telephones located in the day room of the housing unit, if he had an "urgent need," he could seek authorization from an STM manager. (Schultz Decl. at ¶ 13.) The regulations governing STM restrictions note that if telephone restrictions are imposed, inmates must still be permitted access to legal calls. O.A.R. 91-069-0270(3)(b). Consequently, Anello's ability to communicate with the outside world was not unconstitutionally restricted.

With regard to the remaining alleged infringements on his First Amendment right of free speech and expression, the court must evaluate whether the restriction on Anello's rights was "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. Courts must consider four factors: (1) whether there is a "valid, rational connection between the policy and the legitimate governmental interest put forward to justify it;" (2) "whether there are alternative means of exercising the right;" (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally;" and (4) the "existence of obvious, easy alternatives" that "may be evidence that the regulation is not reasonable but is an 'exaggerated response' to prison concerns." *Id.*, at 89-91.

Here, it is undisputed that Anello was on cell restriction for six days and that during this

time, he was denied access to his artwork, newsletters, correspondence, and reading and writing

materials. Defendants contend that the restrictions were imposed as a result of a series of events

which began when Anello was found in possession of what corrections officer Gilbertson believed

were unauthorized copies. This discovery, combined with the fact that Anello's housing unit was

under investigation for extortion, led to a search of Anello's cell, which yielded some evidence

that Anello was in possession of at least some unauthorized items. Anello was placed on cell

restriction while defendants investigated whether Anello had obtained any of his possessions

through unauthorized means. Anello disputes this characterization, instead asserting that

defendants' rationale is mere pretext since they have not put forth evidence, in the form of logs or

reports to support their claims that other cells were searched or that there was actually an ongoing

extortion investigation at the time his property was confiscated.

Even if the court were to disregard the evidence set forth by defendants in support of their

actions and accept Anello's wholly unsubstantiated version of the course of events, there is still

sufficient record support that Gilbertson found Anello in possession of over 40 unauthorized

copies. (Anello Decl., Ex. B.) This alone would justify a search of Anello's cell because it is

well-established that prison officials have legitimate interests in maintaining institutional security

and preserving order by ensuring that inmates are not in possession of contraband. *See*

*Thornburgh v. Abbott*, 490 U.S. 401, 411-12 (1989); *Hudson v. Palmer*, 468 U.S. 517, 527-28.

(1987). Keeping in mind that Anello "bears the burden of pleading and proving the absence of

legitimate correctional goals," the court finds that he has failed to raise an issue of material fact

from which a reasonable factfinder could conclude that defendants' search of his cell and

temporary confiscation of various materials lacked a rational connection to the legitimate

penological goal of maintaining institutional security and preserving order. *Bruce v. Ylst*, 351
F.3d 1283, 1289 (9th Cir. 2003) (citation omitted). The court also notes that even though Anello
was on restriction and deprived of access to his expressive materials, by Anello's own admission
he was able to communicate with other inmates such that he secured writing materials and sent a
grievance. (Compl. at ¶ 58.) Thus, there is no evidence to support Anello's claim that he was
rendered "incommunicado" during the six days that he was on cell restriction. Defendants should
be granted summary judgment on Anello's First Amendment freedom of speech and expression
claims.

### e.  Free Exercise

To establish a violation of his First Amendment right to free exercise of religion, Anello
must prove that:  (1) "the . . . proffered belief must be sincerely held," and (2) "the claim must be
rooted in religious belief, not in purely secular philosophical concerns." *Malik v. Brown*, 16 F.3d
330, 333 (9th Cir. 1994) (internal citations and quotations omitted). Anello must also establish
that defendants "burdened the practice of his religion, by preventing him from engaging in
conduct which is mandated by his faith, without any justification reasonably related to legitimate
penological interests." *Freeman v. Arpaio*, 125 F.3d 732, 736 (9th Cir. 1997) (internal citations
omitted), *overruled on other grounds by Shakur*, 514 F.3d at 884-85.

Anello makes many of the same allegations regarding defendants' alleged interference
with his right to freely exercise his religion as he did for his RLUIPA claim discussed above,
namely that defendants confiscated various religious materials and prevented him from attending
religious services. (Compl. at ¶¶ 53, 55, 64.) He adds that the permanent confiscation of his
religious artwork for the powwow further violated his right to religious exercise. (*Id*. at ¶ 39.) As

discussed in detail above, Anello presents some evidence that his Thelemite religious practices were minimally burdened because he could not perform unspecified detailed rituals in his cell and that the prayer hat has been permanently lost.  It is also undisputed that the copies of the powwow artwork, confiscated initially by Gilbertson when Anello was in the chapel area, were never returned.  (Gilbertson Decl. at ¶ 6; Anello Decl., Ex. 8.)  However, as noted above, Anello has not satisfied his responsibility to demonstrate that he sincerely holds any religious beliefs, much less that the limited restrictions regarding access to these materials burdened the practice of those beliefs in any way, especially in light of the fact that he was permitted to attend religious services during the cell restriction.

However, even assuming that the Free Exercise clause is implicated, defendants have demonstrated that the temporary restriction on access to his property was "reasonably related to legitimate penological interests" as required by *Turner*.  482 U.S. at 89.  The temporary confiscation of Anello's property was rationally related to the investigation of suspected misconduct, given that the entire housing unit was under investigation for extortion, Anello was found with what were believed to be unauthorized materials, and a search of his cell yielded evidence that he was in possession of items that he had not purchased from the canteen.  The fact that some of those materials were religious in nature does not, by itself, rise to the level of a constitutional violation.

Similarly, the permanent confiscation of the allegedly unauthorized artwork copies, even if they were intended as powwow gifts are rationally related to the legitimate penological interests in maintaining institutional security and preserving order because at the time of their confiscation, officials believed they were unauthorized.  (Gilbertson Decl. at ¶ 7, Ex. 1;Schultz Decl. at ¶ 8.)

That Anello disagrees with defendants' finding that the copies were unauthorized is not enough to dispute the legitimate penological goals implicated by his possession of unauthorized materials. Nor is it enough to claim that the otherwise unauthorized materials were going to be used for a religious purpose. Prison officials have legitimate interests in maintaining institutional security and preserving order, and the confiscation of the copies was not an exaggerated response to this legitimate penological interest. Consequently, defendants should be granted summary judgment on Anello's First Amendment free exercise claims

### 2. Fourth Amendment

Anello claims that defendants violated his Fourth Amendment rights when his powwow "giveaway gifts" were confiscated by corrections officer Gilbertson, when Gilbertson retaliated against Anello for protesting the artwork confiscation by searching his cell and dropping his CD player which "contribut[ed] to the further decay of an already faulty product," and when defendants Rux, Mena, and the "Doe" defendant correctional officers confiscated all of his personal property. (Compl. at ¶¶ 37, 42, 44.)

Prisoners have no Fourth Amendment right to be free of the search and seizure of their property because "prisoners have no legitimate expectation of privacy[.]" *Hudson*, 486 U.S. at 530. Here, the bulk of Anello's Fourth Amendment claims relate to the search of his cell and the resulting loss of his property. It is clear that these claims must fail because inmates do not have a reasonable expectation of privacy in their cells or the property within. *Mitchell v. Dunik*, 67 F.3d 216, 220 (9th Cir. 1995) (citing *Hudson*, 468 U.S. at 525-26). However, Anello also alleges that the confiscation of the artwork copies for powwow gifts, which occurred outside of his cell, in an area near the chapel, also amounted to an illegal search and seizure. The fact that the property

confiscation occurred outside of Anello's cell does not change the analysis. Prison officials are authorized to seize contraband or "any articles, which, in their view, dis-serve legitimate institutional interests." *Hudson*, 468 U.S. 528 n.8.

To the extent that Anello attempts to make an allegation of intentional deprivation of property on the basis of Gilbertson's "retaliatory" search of his cell and permanent deprivation of the artwork copies, that claim also fails. As discussed more fully with respect to Anello's due process claims, "[t]he Supreme Court makes clear that protection of an inmate's property is through available state remedies," even if the destruction of the property was an intentional act on the part of a prison official. *Bostwick v. Oregon*, Case No. 09-657-KI, 2011 WL 6046486, at * 3 (D. Or. Dec. 5, 2011) (citing *Hudson*, 468 U.S. at 528 n.8.). Defendants should be granted summary judgment on Anello's Fourth Amendment claims.

### 3. Eighth Amendment

Anello alleges that his rights were violated because he was forced to "forego any form of hygiene" due to the confiscation of his hygiene materials, and because the "totality of the conditions" he was subject to amounted to cruel and unusual punishment. (Compl. at ¶¶ 57, 65.)

The Eighth Amendment requires prison officials to provide humane conditions of confinement by ensuring that inmates receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Where an inmate alleges injuries stemming from unsafe conditions of confinement, he must "meet two requirements, one objective and one subjective." *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000) (citations omitted). To satisfy the objective element, the inmate must show that the conditions of confinement posed a risk of objectively, "sufficiently serious" harm. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). To satisfy

the subjective component, prison officials must have been "deliberately indifferent" to a substantial risk of serious harm. *Farmer*, 511 U.S. at 834.   Deliberate indifference is a higher standard than negligence or lack of ordinary care for the prisoner's safety. *Id.* at 835; *see also Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002).  The court must take into account "[t]he circumstances, nature, and duration of a deprivation . . . in determining whether a constitutional violation has occurred." *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000), *cert. denied* 532 U.S. 1065 (2001).  "The more basic the need, the shorter the time it can be withheld." *Id.* (citation omitted).

Here, there is no dispute that the deprivation in question occurred for only six days, and that during that time, Anello was housed in his cell, without a cell mate, and without access to any of his personal property other than state-issued property.  (Schultz Decl. at ¶¶ 7, 11-17.)  He was allowed access to the law library, programs, counselors, medical and mental health services, religious services, work assignments, and official call outs, though he was not permitted to use the telephone without special permission or go to the gym, day room, or recreation yard.  (*Id.* at ¶¶ 13-15.)  Such a deprivation does not rise to the level of a "sufficiently serious" harm necessary to trigger the Eighth Amendment.

Specifically with regard to his hygiene concerns, the record is clear that at a minimum, Anello was permitted to shower and had access to all state-issued hygiene items, which apparently consists of state-issued soap or baking soda.  (*Id.* at ¶¶ 14-15; Pl's Memo. in Resp. to Summ. J. at p. 16.)  There is some dispute as to whether Anello was also permitted access to his personal hygiene items such as toothpaste, deodorant, shaving cream, and shampoo. (*Id.*)  Even viewing the facts in the light most favorable to Anello and assuming that he had access only to state-issued

soap with access to the shower for six days, none of Anello's hygiene concerns rise to the level of an Eighth Amendment violation.

The conditions of Anello's confinement during his six-days of cell restriction can hardly be considered sufficiently serious as to violate the Constitution's prohibition of cruel and unusual punishment. In fact, much more serious confinement restrictions have been upheld on the grounds that they did not violate the Eighth Amendment. *See e.g., Jenkins v. Goldston*, Case No. 09-900-BR, 2011 WL 30582, at * 6 (D. Or. Jan. 5, 2011) (collecting cases). Consequently, defendants should be granted summary judgment on Anello's Eighth Amendment claims.

### 4. Fourteenth Amendment (Due Process)[3]

Anello alleges that his due process rights were violated when his artwork was confiscated and the copies destroyed, when his cell was searched, when he was placed on "lock down" and his property confiscated "for no reason," and when some of his property was permanently lost. (Compl. at ¶¶ 40, 41, 43, 60-62.) Anello vigorously disputes defendants' assertion that the search of his cell was part of a unit-wide investigation into extortion, instead claiming that the search was in retaliation for contesting Gilbertson's confiscation of his powwow artwork and artwork copies. (*Id*. at ¶ 42.)[4]

---

[3] Anello alleges that the confiscation of his property violated his Fifth Amendment right to property. (Compl. at ¶¶ 40, 62.) However, the Fifth Amendment's due process guarantees apply only to the federal government. *Bingue v. Prunchak*, 512 F.3d 1169, 1174 (9th Cir. 2008). Anello names no federal agencies or agents as defendants, rendering the Fifth Amendment due process protections inapplicable. Accordingly, the court will construe Anello's due process claims as arising under the Fourteenth Amendment.

[4] To the extent that Anello may be attempting to bring a claim for First Amendment retaliation, he must allege: (1) that a state actor took some adverse action against him, (2) because of (3) prisoner's protected conduct, which (4) chilled the prisoner's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal. *Rhodes*, 408

The Fourteenth Amendment provides, "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. The Constitution's due process guarantees generally "requires some kind of hearing *before* the State deprives a person of liberty or property. *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (emphasis in original). However, when a prisoner alleges an intentional or negligent deprivation of his property by an *unauthorized* action of a prison official, there is no violation of procedural due process if the state provides an adequate post-deprivation remedy. *Hudson*, 468 U.S. at 533 (intentional deprivations of property); *Parratt v. Taylor*, 451 U.S. 527, 537 (1981) (negligent deprivations of property). This is because "when deprivations of property are effected through random and unauthorized conduct of a state employee, pre-deprivation procedures are simply 'impracticable' since the state cannot know when such deprivations will occur." *Hudson*, 468 U.S. at 533. On the other hand, when the deprivation occurs pursuant to "state law, regulation, or institutionalized practice, it is neither random nor unauthorized, but wholly predictable, authorized, and within the power of the state to control," and the justifications for post-deprivation remedies does not apply and the normal pre-deprivation hearing is required to satisfy due process. *Haygood v. Younger*, 769 F.2d 1350, 1357 (9th Cir. 1985) (*en banc*), *cert. denied*, 478 U.S. 1020 (1986) (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982)); *see*

---

F.3d at 567-68. Here, Anello fails to identify any protected conduct other than the possession of the artwork while in the chapel. (Pl's Memo. in Resp. to Summ. J. at pp. 6-7.) Merely possessing something of creative or religious value while in a religious area does not, without more, rise to the level of protected conduct, especially in the absence of any evidence that defendants' actions were not related to a legitimate penological goal. As discussed in detail above, Anello has offered no evidence to prove that defendants' actions were not reasonably related to the legitimate penological goals of maintaining institutional security and preserving order. Thus, Anello has failed to allege that he engaged in protected conduct necessary to support a retaliation claim.

*also Zimmerman v. City of Oakland*, 255 F.3d 734, 737-38 (9th Cir. 2001).

In Anello's briefing, he seems to allege that his due process rights were violated by "a long-standing policy of depriving inmates of their constitutional rights," but he fails identify what policies have allegedly established this "pattern and practice of violating inmate's rights." (Pl's Memo. In Resp. To Summ. J. at p. 11.) Instead, he points only to the "long history of litigation against the Department Corrections." (*Id*.) The Complaint centers upon Anello's dissatisfaction with being placed on cell restriction and having his property confiscated without explanation and without ever having a chance to protest the confiscation or have a hearing. (Compl. at ¶¶ 41, 60-61.) Therefore, it appears clear that Anello is not actually challenging any particular prison procedure, but rather that the property confiscation and loss of privileges was unauthorized. The question is whether he was afforded adequate post-deprivation procedures, as required by *Hudson/Parratt*.

Here, Anello did access the post-deprivation remedy process available through ODOC when he filed grievances and a Notice of Tort Claim, and which were ultimately resolved when he accepted replacement property for the lost property. However, he may also initiate a negligence or small claims action in state court. *Giba v. Cook*, 232 F.Supp. 2d 1171, 1184 (D. Or. 2002) (describing the available state law remedies available in Oregon for an alleged intentional deprivation of property, and noting that even if the "remedy is difficult to obtain from prison . . . [it is still] legally available."). Consequently, Anello's due process claims related to the allegedly unauthorized confiscation and loss of his property fail and he must pursue these remedies under state law.

Finally, to the extent that Anello alleges a violation of procedural due process on the basis

of being placed on cell restriction and denied certain privileges during the six-days after his cell

was searched and property confiscated, this claim also must fail.  In order to trigger the due

process clause on account of a temporary restriction of an inmate's privileges, officials must have

imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of

prison life." *Sandin v. Connor*, 515 U.S. 472, 484 (1995) (due process not triggered by a 30-day

term in disciplinary segregation).  "Discipline by prison officials in response to a wide range of

misconduct falls within the expected perimeters of the sentence imposed by a court of law." *Id*. at

481: *see also Giba*, 2007 F.Supp. 2d at 1182 (finding that seven days of lost privileges did not

amount to an atypical and significant hardship).

D.  Conclusion

    Defendants have submitted evidence that Anello's cell was searched as part of a unit-wide

extortion investigation.  Anello disputes that there was an ongoing investigation or that any other

cells were searched, and that since he was not ultimately disciplined for possessing any

unauthorized property, defendants had no legitimate purpose in confiscating his property,

searching his cell, or placing him on cell restriction for six days.  Despite his disagreement with

the way that defendants characterized the facts in their supporting affidavits and exhibits, he has

presented no evidence to create a material issue of fact other than his own conclusory statements.

Regardless of defendants' "true" motivations for the above actions, when corrections officer

Gilbertson saw Anello in possession of what he believed to be unauthorized materials, the

subsequent search of his cell and possessions was reasonably related to the legitimate penological

goals of institutional security and preserving order.  The resulting confiscation of property and cell

restriction during the limited six-day period of investigation was reasonable and not violative of

any of Anello's statutory or constitutional rights.

E.  Qualified Immunity

Defendants contend that they are entitled to qualified immunity as individuals for any alleged violations of Anello's rights.  The doctrine of qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages[5] insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Therefore, public officials are generally immune from civil liability unless their actions violate clearly established law because "a reasonably competent public official should know the law governing his conduct." *Id*.  "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (citation and internal quotations omitted).  The key inquiry in determining whether an officer has qualified immunity is whether the he or she has "fair warning" that the conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002).

In order to determine whether the doctrine of qualified immunity applies to individual defendants, the court must decide whether the plaintiff has shown that a constitutional or statutory

---

[5] Qualified immunity does not extend to claims for declaratory relief. *Malik*, 330 F.3d at 335 n.4 (citing *Los Angeles Police Prot. League v. Gates*, 995 F.2d 1469, 1472 (9th Cir. 1993).  Anello briefly mentions that he seeks declaratory relief in the opening paragraph of his Complaint, but in his prayer for relief he requests primarily monetary relief.  (Compl. at ¶¶ 67-71).  Because Anello establishes no facts upon which liability of any defendants may be based, the court should exercise its discretion and deny Anello's vague request for declaratory relief. *Doe v. Gallinot*, 657 F.2d 1017, 1024 (9th Cir. 1981); *United States v. State of Washington*, 759 F.2d 1353, 1357 (9th Cir), *cert. denied*, 474 U.S. 994 (1985) ("Declaratory relief should be denied when it will neither serve a useful purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties.").

right has been violated and whether the right at issue was "clearly established" at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Lower courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

As discussed above there is no genuine issue of material fact regarding whether Anello's constitutional or statutory rights were violated, so the court need not reach the issue of whether the rights were clearly established. Defendants should be granted qualified immunity.

### Recommendation

For the reasons discussed above, defendants' motion for summary judgment (docket # 46) should be GRANTED.

### Scheduling Order

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due April 6, 2012. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 20thday of March, 2012.

JOHN V. ACOSTA
United States Magistrate Judge